All righty, that brings us to Blitz Telecom Consulting, LLC, v. Peerless Network, Inc. Good morning, Your Honors. My name is Henry Kelly. I'm an attorney representing Peerless Network. I'm joined today by colleague Brittany McElmurray and Chief Financial Officer for Peerless Network, Mr. Douglas Lee. May it please the Court, Counsel. There's a couple issues on appeal. But I'd like to spend my time this morning, with your permission and unless you direct otherwise, to focus on two orders that the district court had entered. The first order that I want to discuss is that the court erred in granting plaintiff's motions for summary judgment on its declaratory judgment motion to interpret the change in law provision of the party's agreement too narrowly. There, the court also granted summary judgment and failed to consider Peerless Network's affirmative defense that was excused from performance due to frustration of purpose. Second, after I address those, I'd like to address the common issues of fact and law between this case and the other case that was pending before the district court and explain why the court should not or should have consolidated those two cases. The first issue, the contract issues are, of course, reviewed de novo and with respect to the failure to consolidate the two cases that were pending before the judge, that's an abuse of discretion standard. Two contract provisions that are really important in the case. First of all, there was an agreement between the parties Peerless and Blitz where Peerless would pay a co-marketing fee of the revenue that was received on long-distance carrier or interlatter traffic. And secondly, there was a change in law provision that allowed the parties to serve a notice to renegotiate if there was any legal action that materially affected the ability of a party to perform a material obligation under the agreement. Peerless, I know you're familiar with the facts, but I think you understand some of how the law that came into place may have changed the parties' agreements. Let me explain a little bit about the telecommunications issues that were at issue. Peerless is a telecommunications provider. Blitz is one of its customers. Peerless provides services to Blitz and Blitz then provides services, uses those services and resells those services to some of its customers. The calls in question here all go from long-distance carriers or local exchange carriers, third-party carriers through Peerless. Peerless then delivers those calls to Blitz and then Blitz either has the services or delivers those calls to its customers. Testimony was that the records below reflect that about 60% of Blitz's customers were prepaid calling card providers. On the traffic that's at issue, Peerless would typically collect two forms of compensation from these other third-party carriers. The long-distance carriers would pay Peerless what's called interladder or switched access. The local exchange carriers would pay Peerless what's called reciprocal compensation. And then the idea was under the contract, Peerless would share 30% of the interladder or the inter-carrier compensation that was received by Peerless, Peerless would share that with Blitz. In March 2000, I'm sorry, in February 2012, there was a decision issued by a district court in Texas, the Southwestern Bell versus IDT decision. In that decision, the district court concluded that as to Southwestern Bell and IDT, that when calls go from a local exchange carrier to another local exchange carrier to a prepaid calling card platform, that those calls are in fact long-distance calls, not local calls. And the court concluded that in that scenario, the prepaid calling card provider has an obligation to pay the local exchange carriers long-distance switched access fees. That was not the arrangement that the parties founded their agreement on. The agreement that was at issue in front of the district court, Peerless was collecting revenue from third-party carriers, the reciprocal compensation, long-distance carriers, and paying a portion of it to Blitz, who had prepaid calling card customers. In light of the IDT decision, what the industry did and what that court ruled was that Peerless and any local exchange carrier that was exchanging traffic within the scenario would be able to receive long-distance revenues or switched access fees from the prepaid calling card providers to which the traffic was destined. So that IDT decision had a material effect on the parties' agreements. The court- Blitz services? Well, Peerless could collect payment on some of Blitz traffic to the extent it wasn't destined to prepaid calling card platforms. And isn't that all you were required to pay a percentage of to Blitz? Yes, but here's how that scenario, though, changed the agreement between the parties. Peerless could, under that scenario, collect, in light of the IDT decision, could have collected revenue from either Blitz to the extent it provided prepaid calling card platform. And there's no evidence that it did. Or it could collect money from the Blitz customers that were prepaid calling card platforms. If under the IDT decision, it would make no sense under the parties' agreement for Peerless to share 30% of the revenue under the contract when it's collecting money from either Blitz or Blitz's customers. That is the material change in law that affected the obligation of Peerless to pay. And I think the court below, there was evidence in the declarations in response to the motion for summary judgment that Peerless was only collecting about 16% of its revenue from long distance providers in light of the IDT decision. But the court kind of hung up on that and made the same point you did, Your Honor, that well, if you collected 16%, just pay 30% of what you collected. The court ignored the whole fundamental shift in how the IDT decision changed the business relationship between the parties. Instead of Peerless delivering traffic to Blitz and its prepaid calling card customers and having no right to charge those companies, the IDT decision said that Peerless could charge those prepaid calling card providers switched access. And it would make no sense under the parties' agreement for Peerless to then share 30% of that with Blitz. And that was the fundamental error that the court ignored. The court actually followed the analysis correctly, but then looking at the Flex Log Dictionary... Let me ask you a question, if you don't mind, about the effect here. The IDT order was issued by a district court, you said, right, in Texas. And it was... Does it have any... I mean, obviously, it has an effect in that district. Does it have any effect beyond that district? There was another fundamental problem with the court's order. The court said it bought Blitz's argument that it was neither binding other parties nor precedential in the Northern District of Florida. But that's not the contract language. The contract language really is a... It was any legal decision could trigger the change in law provision. So it didn't have to be precedential, it didn't have to be binding. The court found that the contract was unambiguous. But it had to have a material effect. It had to have a material effect. And in light of that decision, Peerless could have begun to bill the prepaid calling card providers for switched access charges. But the parties never got to exercise that because of the court's ruling. The court also rejected Peerless's frustration of purpose from a defense. It seems like that wasn't pled with very much specificity. In fact, it doesn't even use the term frustration. It says, Peerless performed all duties owed under the party's agreement other than any duties which were prevented or excused and therefore never breached any agreement with Blitz. That's right, Your Honor. And the Illinois Pattern Jury Instructions provides that. This is the jury instruction for that affirmative defense. The law excuses a defendant's ability to keep its promise if the purpose of the promise was frustrated or the promise was impossible to perform. And where are the allegations in your pleadings that it was impossible to perform? We didn't use, I agree, Your Honor, that we did not use the actual elements of the frustration of purpose defense in the affirmative defenses. But the rules for pleading, particularly when it comes to affirmative defenses, is the plaintiff put on notice that that's your affirmative defense. Peerless raised this frustration of purpose defense in response to a summary judgment motion filed by Blitz two and a half months before the closed discovery. Now the court didn't consider or didn't rule upon that until many, many months after the closed discovery. But Peerless spent a significant amount of time in its briefs. Blitz responded to it. And rather than the court addressing specifically the frustration of purpose defense that Peerless had argued in the summary judgment motions prior to the close of fact discovery, two didn't even consider it in his order. But wasn't the summary judgment order limited to an interpretation of the change in law provision? I'm having a little bit of trouble because my understanding is the district court just kicked it down the road and said you can still raise that defense. It just said you can't use it in summary judgment. And I'm just, I'm a little confused about the connection between the change in law on which the summary judgment was based and the frustration defense. Blitz had raised before the close of discovery, Blitz filed a, it's like an early stage motion for summary judgment on its declaratory judgment count. And said that under the contract, asked for a ruling that under the contract the change in law provision was not triggered. And the court, and then there was after the close of discovery there was some additional briefing on the summary judgment motion. And the court addressed both of those sets of pleadings and issued an order in roughly I think November or December 2015. The first motion that Blitz filed was in May of 2015. Pierce responded in May of 2015. Discovery closed in July of 2015. And the court ruled on all of those summary judgments at the end. But the point is that really the pleading standard is there a prejudice to Blitz for not having, under Rule 8a, you can, the real question under 8c, I'm sorry, under Rule 8c the question is does the plaintiff have proper notice of the affirmative defenses? And in the court's ruling the court denied Peerless the opportunity to argue that frustration of purpose affirmative defense, concluding that it wasn't sufficiently pled. We should have at least, Peerless should have at least been given the opportunity to replead and that opportunity was not given, given the timing of the ruling on the motion. Thank you, counsel. Thank you. May it please the court. Lee Marcus for Blitz Telecom Consulting, LLC, the appellee. I'd like to start by addressing, there were really four points raised on appeal. The first was a jurisdictional question. I believe that has been resolved by the court's orders. But what I'd like to do is skip, since it is a quicker argument that we can get to quickly, I'd like to address the final argument, which my colleague did not address, and that is the question of whether there was an abuse of discretion in allowing evidence regarding types of traffic for the purpose of damages that were not part of the interlatta language that was in the original contract. Now, the argument that the appellant makes is that we did not plead anything other than interlatta traffic, and so we would not be entitled to anything other than interlatta traffic, and therefore we should not be able to introduce evidence, and it was error on the part of the trial court to allow evidence of other types of traffic. Well, as the trial court found, when we, well, let me back up. As Mr. Kelly stated, the pleading requirement is that a party be on notice of the issues being raised. The trial court expressly found at document 200 in the record that our pleading, our complaint, did put Peerless Network on notice that we were seeking damages for all violations of the contract and that we were seeking all types of traffic. Mr. Kelly himself at the pretrial conference informed the district court that they anticipated we would be looking to introduce evidence of types of traffic other than interlatta traffic, which is what prompted us to renew a motion to amend the complaint just to make it clear, and the court responded by saying, you don't need to do that. The motion was denied. It was frankly the best denial of a motion I ever got because the court said, I'm denying it. You don't need to amend. You've already asked for it, and so the contention that there was surprise at trial when Mr. Kelly stated to the court in open court that they anticipated we would be introducing this type of evidence three months prior to the trial beginning, well, that doesn't ring true. There was no surprise, and there was an express ruling which has not been appealed where the district court said, we're good. The pleading's included. So, having addressed that point, let me go to the question that Mr. Kelly was addressing, which is the summary judgment on the question, the interpretation, which is a legal issue, of the contract provision. Now, the change in law provision allows peerless to renegotiate the contract, not to just unilaterally stop paying us, but to renegotiate the contract if there is a judicial action that materially affects peerless' ability to perform any material obligation under the contract. As we stand here today, peerless still has never identified for the district court or for this court or even for Blitz what material obligation was affected. And that's an important point here, because on summary judgment, there needs to be some indication of what is the material fact question. What is the genuine issue? Peerless presented the declaration of its CEO, John Barnicle, where he talked about such things as Mr. Kelly was just discussing, that, well, before the IDT decision, we were able to collect a lot more. After the IDT decision, we were only able to collect about 16% of what we were collecting on Blitz traffic prior to the IDT decision. Well, what is the material obligation here? The material obligation under the contract is to pay Blitz 30% of what you collect on its traffic. And relating to the question of the various types of traffic, the evidence at trial was unequivocally that peerless had the obligation to pay on all traffic, not just interlata, not just access, not reciprocal compensation, all of it. Scott Kell, the Executive Vice President at Peerless, who is responsible for billing, testified at trial that the CAB's billing included all of these things. Mr. Barnicle, the CEO, Mr. Knight, the individual who signed the contract and negotiated the modification for Peerless, they testified we were paying on all traffic. Mr. Kelly, in his closing argument, stated the parties agree that we were paying on all traffic. So the question of, well, there are these different types of traffic that you need to look at, and the Blitz and the IDT decision dealt with this type of traffic and called into question what we have to pay. No, they were paying on all traffic. And that was effective August 1, 2011. A little math here, about eight months before the IDT decision came out. So when IDT comes out, they're paying on all traffic. So the question then is, all right, well, what obligation are we looking at? The obligation to pay 30% of what you collect. If before you were collecting $1,000 on our traffic and now you're only collecting $160 on our traffic, you no longer have the obligation to pay us $300. You now have the obligation to pay us $48, 30% of the $160. And so our position, and the district court agreed, is there is no material obligation that has been affected in any way, regardless of whether it is a, quote, material effect. There is no effect. Now, Mr. Kelly says, well, we should have been allowed to argue frustration of purpose. Well, first off, the district court correctly observed that Peerless did not plead frustration of purpose. It did not even plead excuse. The ninth affirmative defense that Peerless points to pleads performance. They say, we performed everything we had to do other than whatever may have been excused. That's not an allegation that we were excused from something, or even putting Peerless, putting Blitz on notice as to why they were excused. That's why the cases out of Illinois that talk about the pleading of frustration of purpose specifically say that you must specifically allege the elements of frustration of purpose. Now, Peerless correctly observes in its reply brief that there is a different pleading standard in the federal courts than there is in the state court. Understood. But even under Rule 8, where the requirement is putting Blitz on notice of the argument, that wasn't done. The first time frustration of purpose ever reared its head in this case was in response to the motion for summary judgment. And as the district court observed, that's improper. You have to plead it before you argue it in response to a motion for summary judgment. Now... Was frustration of purpose relevant to the question before the court on summary judgment? Frankly, I don't believe it was. And what I was about to inform the court is that even if frustration of purpose were a viable defense to consider, it's not satisfied here. Because the question here is not a matter of were one of the elements of frustration of purpose is that you need to essentially destroy any value that Peerless would obtain through this contract. That their reason for getting into this deal is gone. And... But isn't that essentially their argument on the change in law? Sort of like the fundamental premise behind the contract was gone after the change in practice that followed the IDT decision? Well, that is part of what has developed as their argument. And quite frankly, looking at the facts, it doesn't apply. And looking at the law of Illinois, it doesn't apply. Judge Ripple was on a panel of the Quintero's case that we cited where there is a very clear statement that for the purpose of frustration of purpose, the fact that you are disappointed really doesn't do it. Ordinary business risks associated with market fluctuations, financial instability, or company failures have never been a sufficient basis on which to invoke frustration or impracticability because businesses knowingly take on such risks when they enter commercial transactions. It does not matter that it is an act of government that may have made the contract less advantageous to one party. So even if the IDT decision were actually a judicial act that mattered, which it wasn't, because A, it is a district court decision in Texas that is not binding on anyone other than the parties to that case, and in fact has no precedential value even for that same judge in the next case. But it is an unpublished opinion that doesn't even appear in Westlaw or Lexis. If you want to find that case, you have to go to the Northern District of Texas to find it. It's not out there. And so to argue that that materially affects the obligations of parties to a contract governed by Illinois law, one of whom is an Illinois company and one of which is a Florida company, is specious. There is no binding effect on these parties or on this contract. Now, were the IDT decision a Fifth Circuit case that says it is illegal to route prepaid traffic in the state of Texas, or it is illegal to route prepaid traffic, period. Then they can comply with their obligation. Exactly. The obligation there is the routing of traffic. And they now have an appellate court, a circuit court opinion, interpreting FCC law. That's another important factor here. We're talking about creation of law versus interpretation of law. Mr. Kelly talked about, and I wrote down what he said, he referred to the IDT decision as law that came into place. Well, no. It's not law that came into place, questionably law at all, other than as it relates to those two parties. But what the IDT decision did is the district court judge there looked at the 1996 Telecommunications Act, which is expressly referenced in our contract, and it applied the language of a 2006 FCC administrative order and said, based on the language in this FCC order, the prepaid carriers are considered carriers who have to pay access charges. That was it. It applied the 2006 FCC order to 1996 legislation. Our contract was in 2011. Correction, signed in November 2010. These laws, to the extent they are laws, were in place. It was merely the application of law to new circumstances because now prepaid carriers, instead of calling through an 800 number, you could call through a local number. And so there was a question, well, how do we apply the law to this? It's no different than if Blitz were to come in and say, all right, well, we are going to start making left turns on a red signal. Well, no, no, no, no, no, no. We're going to apply the existing law that says you can go straight, you can't go straight, you can make a right turn on red. That law, it's in place. We're going to apply it to your new theory, to your new circumstances. And that's what happened in the IDT case. It wasn't new law. Now, in the briefs, Peerless argues that the application here completely thwarts the contract. Well, no. The evidence at trial and from the jury's verdict was that Peerless collected $7.8 million on Blitz's traffic, which meant that they owed about $2.3 million to Blitz. Instead, they chose to keep all of it. And may I finish my point briefly? Very briefly. Okay. Under a frustration of theory purpose, the remedy is not I get to keep everything under a contract that has now been frustrated. The remedy is you have to purge yourself of the benefit of the contract, which would mean pay Blitz the full $7.8 million, not keep it all for yourself. Thank you, counsel. Thank you. So I think Mr. Marcus, towards the end of his argument, acknowledged that the IDT decision applied FCC decision in a way that had not previously been considered on calls from a local exchange carrier to a local exchange carrier and whether switched access charges apply in that scenario. And I think he said, I tried to write down, that IDT decision resolved the question, a quote, according to Mr. Marcus, how do we apply this prior FCC decision to these call scenarios of calls from one local exchange carrier to another local exchange carrier involving prepaid calling card traffic? In response to the argument from opposing counsel, what is the most direct way that you can put what your obligation was that was materially affected under the contract? Our obligation was to collect inter-carrier, to pay inter-carrier, on the inter-carrier compensation that we collected, that peerless collected, we had to pay 30% of that to Blitz. The reason that it changed, the reason, and remember, any legal decision, it didn't have to be precedential, it didn't have to be binding, it didn't have to be in the district court. But how did that decision affect your obligation to pay 30% of what you collected? Right, it had a material effect on the obligation because instead of peerless collecting from long-distance carriers and local exchange carriers for this traffic that was destined to Blitz, peerless could bill Blitz to the extent it had prepaid calling card and remit 30% of that collection, in theory, to Blitz itself. Or peerless could bill the prepaid calling card providers and, in theory, remit 30% of that to Blitz. That's not at all what the arrangement was under the party's agreement. The agreement was that peerless would collect from third-party carriers and remit a portion of that to Blitz. It wouldn't, that was the premise of the contract. The IDT decision changed that. But why is that, why is that a material change in the obligation? I'm sorry, please bear with me. That's quite right. I think at a minimum, first of all, we don't have to, I think it changed, we believe it does change it. Instead of collecting from third-party carriers, we're collecting from our customer and remitting payment back to that customer. Why does that make a difference, though? Why is that a material change in your obligation to pay them 30% of what you collect? That's not at all what the contract says. I mean, the parties, peerless was supposed to provide a service to Blitz, not collect from Blitz and remit 30% back to it. That's just, to me, it's just not at all the, it's not at all what the contract contemplated. And I'd point out that, really, the court found that that material effect language, the court focused on the material obligation. We focus on the material effect to the party's obligations. And we think, and we've argued, that that is ambiguous, and it was wrong error for the court to decide that the term material effect on the party's obligation was unambiguous, and then to simply conclude that it didn't have any effect on the payment obligation. We think that we should have been able to go to the jury with the question of whether there was a material obligation. Finally, with respect to the frustration of purpose, I'd point out that there's a case in the Tenth Circuit, Yellen v. Cooper, where the courts have held that even if a party doesn't plead an affirmative defense, courts can still consider that where it's obvious from the pleadings that that affirmative defense is proper. And again, that relates to the notice under Rule 8c. If a party has notice of the affirmative defenses, it can certainly plead, it can raise those timely, and PIROS did raise that issue timely. Thank you, counsel. Thank you very much. We'll be in recess until tomorrow. All rise. Thank you.